Oliver J. H. Stiefel (OSB No. 135436, *applicant*, *pro hac vice*)
oliver@crag.org
Mike Sargetakis (OSB No. 174607, *applicant, pro hac vice*)
mike@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Phone: (503) 227-2212
Fax: (503) 296-5454
LEAD COUNSEL

René P. Voss (CA Bar No. 255758)
Natural Resources Law
15 Alderney Road
San Anselmo, CA  94960
Phone:  (415) 446-9027
Email:  renepvoss@gmail.com
LOCAL COUNSEL

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SAFE ALTERNATIVES FOR OUR FOREST ENVIRONMENT,** a California non-profit corporation**; KLAMATH FOREST ALLIANCE,** a California non-profit corporation**; and CONSERVATION CONGRESS,** a California non-profit corporation**,**<br><br>          Plaintiffs,<br>     vs.<br><br>**RACHEL BIRKEY,** in her official capacity as Forest Supervisor of the Shasta-Trinity National Forest**;** and **the UNITED STATES FOREST SERVICE,**<br><br>          Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(NATIONAL ENVIRONMENTAL POLICY ACT, ADMINISTRATIVE PROCEDURE ACT CLAIMS) |

1

## GLOSSARY OF TERMS

| APA | Administrative Procedure Act |
|---|---|
| BiOp | Biological Opinion |
| CC | Conservation Congress |
| CEQ | Council on Environmental Quality |
| Defendants | Rachel Birky and United States Forest Service |
| DM | Decision Memorandum |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| Forest Service | United States Forest Service |
| Hazard Tree Guidelines | Forest Service internal guidelines for identification and mitigation of hazard trees |
| KFA | Klamath Forest Alliance |
| LAA | Likely to Adversely Affect |
| NEPA | National Environmental Policy Act |
| NLAA | Not Likely to Adversely Affect |
| Project | McFarland Project |
| SAFE | Safe Alternatives for our Forest Environment |
| USFWS | United States Fish and Wildlife Service |

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

## INTRODUCTION

1.     Plaintiffs Safe Alternatives for our Forest Environment, Klamath Forest Alliance, Conservation Congress (collectively, "SAFE" or "Plaintiffs") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to the final administrative action of Rachel Birkey and the United States Forest Service (collectively, "Forest Service," "agency," or "Defendants").

2.     In approving the McFarland Fire Recovery Project ("McFarland Project" or "Project") on the Shasta-Trinity National Forest ("Forest"), Defendants acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h.

3.     In 2021, the McFarland fire burned in a mosaic pattern across the Forest and adjacent State and private lands. The Forest Service proposed the Project to address post-fire conditions.

4.     The Project authorizes a variety of silvicultural treatments including but not limited to logging of live, green trees and standing dead trees; prescribed burning; and pruning across a 2,138-acre Project area.

5.     Approximately 2,118 acres of the 2,138-acre Project area is designated critical habitat for the northern spotted owl ("NSO"), which is listed as "threatened" under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544. The Project area is home to one of the few remaining breeding pairs of NSOs across the entire Forest.

6.     The Forest Service conducted a Biological Assessment ("BA") pursuant to the ESA, 16 U.S.C. § 1536(c), and concluded that the Project "may affect," but is "not likely to affect" NSO.

7.     The United States Fish and Wildlife Service ("USFWS"), the agency with jurisdiction over terrestrial wildlife species listed under the ESA like NSO, reviewed the BA and disagreed with the Forest Service's "not likely to adversely affect" conclusion. The USFWS concluded instead that the Project would have significant localized impacts.

8.     Specifically, the USFWS determined that the Project was "likely to adversely affect" NSO to the degree that it was reasonably certain to cause "take" of six owls. "Take" is a term of art under the ESA meaning to "harass, harm, pursue, hunt, wound, kill, trap, capture, or collect or

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    attempt to engage in any such conduct" with a listed species. 16 U.S.C. § 1532(19).

2        9.      The USFWS found take reasonably certain to occur because the Project would result

3    in reduced quality of important habitat elements essential to NSO and their prey. The degradation,

4    removal, and modification of habitat, according to the USFWS, is expected to significantly impair

5    the breeding, feeding, and sheltering behavior of adult owls and their young.

6        10.     Nevertheless, the Forest Service approved the Project pursuant to a Categorical

7    Exclusion ("CE") under NEPA reserved for "timber stand and/or wildlife habitat improvement

8    projects." 36 C.F.R. § 220.6(e)(6) ("CE-6"). CEs apply to categories of actions that the Forest

9    Service has determined pose no significant environmental effects, either individually or

10   cumulatively, and therefore do not require detailed analysis in an Environmental Impact Statement

11   ("EIS") or even a less intensive Environmental Assessment ("EA").

12       11.     SAFE challenges the Forest Service's reliance on CE-6, and attendant failure to

13   prepare an EIS or EA, in two respects.

14       12.     First, despite the known, quantifiable impacts to NSO individuals and habitat, the

15   Forest Service incongruously concluded that the Project fits under CE-6, applicable to "wildlife

16   habitat improvement" activities. Under no reasonable interpretation of CE-6 can a project that

17   degrades habitat to the degree that it would cause take of an imperiled species be deemed "wildlife

18   habitat improvement."

19       13.     Second, if the Project fits under CE-6, "extraordinary circumstances" exist that

20   preclude the use of a CE. Pursuant to 36 C.F.R. § 220.6(b), the Forest Service must consider certain

21   resource conditions that dictate whether further analysis and documentation in an EIS or EA are

22   required. One such resource condition is federally listed species and designated critical habitat. 36

23   C.F.R. § 220.6(b)(1)(i). In determining whether "extraordinary circumstances" exist, the Forest

24   Service must consider the cause-effect relationship between the proposed action and listed species

25   and the degree of any potential effects. 36 C.F.R. § 220.6(b)(2).

26       14.     Here, the degree of the Project's effects on threatened NSO may be significant,

27   requiring further analysis in an EIS or EA. Indeed, the Project's effects could not be more significant

28   on the breeding NSO pair in the Project area: Take is reasonably certain to occur. Take of a

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

threatened species is an extraordinary circumstance that precludes the use of a CE.

15.     SAFE respectfully requests that this Court vacate the approval of the Project and remand to the Forest Service for preparation of an EIS or EA containing full and fair analysis of the Project's environmental impacts.

16.     If necessary, SAFE intends to seek narrowly tailored injunctive relief during the pendency of this litigation to protect imperiled species and their habitats and other resources that are adversely affected by the Project.

17.     Should it prevail, SAFE will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701 et seq. (Administrative Procedure Act) and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act). Plaintiffs have exhausted all administrative remedies and the violations of law claimed below are ripe for judicial review.

## VENUE

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the district serves "the county in which the action arises." A civil action arises in the county in which "a substantial part of the events or omissions which give rise to the claim occurred[.]" 28 U.S.C. §1391(e)(1). The McFarland Project area and the Shasta-Trinity National Forest Supervisor's office are located in Trinity and Shasta Counties, respectively, which are served by the Eastern District of California.

20.     **Intradistrict Assignment**. Pursuant to L.R. 120(d), assignment of this matter to the Sacramento Division of the Eastern District is proper because Trinity and Shasta Counties are served by the Sacramento Division.

## PARTIES

21.     Plaintiff SAFE ALTERNATIVES FOR OUR FOREST ENVIRONMENT ("SAFE") is a 501(c)(3) non-profit conservation organization incorporated in the State of California and based in Trinity County, California. SAFE was founded in 1979 to advocate for and inform the public

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    about environmentally sound forest management. SAFE has worked for decades to reduce the

2    number of clear cuts and herbicide spray sites on both public and private lands in Trinity County.

3         22.    Plaintiff KLAMATH FOREST ALLIANCE ("KFA") is a 501(c)(3) non-profit

4    conservation organization incorporated in the State of California and based in Arcata, California.

5    KFA works in the public interest with the mission to promote sustainable ecosystems and sustainable

6    communities. KFA was founded in 1989 by residents of the Klamath and Salmon River watersheds

7    and represents over 500 members and supporters. KFA participates in forest planning through

8    agency engagement, substantive comments, and collaboration with the goal of protecting and

9    restoring the biodiversity, fisheries, wildlife, mature forests, and public lands of the Klamath-

10   Siskiyou Mountain region, including the Shasta-Trinity National Forest. KFA's members and

11   supporters use and enjoy the Project area and would be irreparably harmed if the Project moves

12   forward.

13        23.    Plaintiff CONSERVATION CONGRESS ("CC") is a 501(c)(3) non-profit

14   organization incorporated in the State of California, dedicated to maintaining, protecting, and

15   restoring the native ecosystems of northern California. Conservation Congress has a longstanding

16   organizational interest in the proper and lawful management of National Forests located in northern

17   California, including the Shasta-Trinity National Forest. Conservation Congress also has an

18   organizational interest in the protection of the NSO. Conservation Congress' members, staff, and

19   board members participate in a wide range of aesthetic, scientific, business, and recreational

20   activities, such as hiking, fishing, hunting, photography, wildlife viewing, appreciation of scenery,

21   and bird watching, including attempts to view and appreciate the NSO in the Shasta-Trinity National

22   Forest, including the specific federal lands involved in the Project, and have concrete plans to

23   continue these activities. The organization's membership includes professional photography

24   businesses and freelance photographers who earn income by photographing in northern California's

25   National Forests. Conservation Congress' members, staff, and board members pursue, and have

26   concrete plans to continue pursuing, these aesthetic, scientific business and recreational activities,

27   including on the lands involved in the Project. These interests of Conservation Congress, its

28   members, officers, and staff are substantial and are adversely affected by Defendants' failure to

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

comply with NEPA. The requested relief would redress the injuries of Conservation Congress and its members, staff, and board members.

24.     Plaintiffs, and their members, supporters, and staff regularly visit and enjoy the Forest, including the Project area, and intend to do so again in the near future. The members, supporters, and staff appreciate the aesthetics of the Forest and use the area to engage in recreational, scientific, and spiritual activities, such as hiking, camping, fishing, photography, watershed research, and observing wildlife.

25.     Plaintiffs have organizational interests in the proper and lawful management of the Forest. Plaintiffs, and their members, supporters, and staff have participated extensively in relevant administrative actions and have actively participated in the Project's administrative process.

26.     Plaintiffs, and their members, supporters, and staff would sustain injury to aesthetic, educational, recreational, spiritual, and scientific interests if the Project proceeds as authorized. Plaintiffs, and their members, supporters, and staff have concrete plans to return to the area where the Project is proposed. Unless this Court grants the requested relief, Plaintiffs, and their members, and staff will be adversely and irreparably harmed by the Project.

27.     Defendant RACHEL BIRKEY is the Forest Supervisor for the Shasta-Trinity National Forest. Ms. Birkey is sued in her official capacity. Ms. Birkey signed the Decision Memorandum approving the Project.

28.     Defendant UNITED STATES FOREST SERVICE ("Forest Service") is an agency within the U.S. Department of Agriculture. The Forest Service manages the Shasta-Trinity National Forest.

## **LEGAL BACKGROUND**

### **National Environmental Policy Act**

29.     Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 6

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

30.     NEPA and its implementing regulations promulgated by the Council on Environmental Quality ("CEQ") establish that NEPA's twin aims are to (1) ensure fully informed decision-making, and (2) provide for public participation in environmental analysis and decision-making.[1]

31.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as the Environmental Impact Statement or EIS, the detailed statement must describe, inter alia, the adverse environmental impact of the proposed action and alternatives to the proposed action. *Id*.

### Categorical Exclusions under NEPA

32.     CEQ regulations direct federal agencies to identify in their NEPA procedures certain categories of actions that normally do not require preparation of an EIS or EA, which is a concise public document which briefly provides sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact.

33.     The Forest Service promulgated a series of categorical exclusions pursuant to the 1978 version of the CEQ regulations, which defined "categorical exclusion" as a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect by a federal agency in implementation of these regulations. 40 C.F.R. § 1508.4 (2019); 57 Fed. Reg. 43,180 (Sept. 18, 1992) (establishing categories); 73 Fed. Reg. 43,084 (July 24, 2008) (placing established categories under Forest Service NEPA regulations at 36 C.F.R. Part 220).

34.     36 C.F.R. § 220.6(a) provides that a proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary

---

[1] The CEQ promulgated regulations implementing NEPA in 1978. 42 U.S.C. § 4342 (establishing CEQ); 40 C.F.R. §§ 1500–1508 (2019) (CEQ's NEPA regulations). CEQ modified the NEPA regulations by final rule on July 16, 2020, 85 Fed. Reg. 43,3304 (July 16, 2020) (codified at 40 C.F.R. §§ 1500–1508 (2021)), but has since rescinded portions of the 2020 modifications, effective May 20, 2022, 87 Fed. Reg. 23,453 (April 20, 2022) (codified at 40 C.F.R. §§ 1500–1508 (2022), and issued a Notice of Proposed Rulemaking to further amend the 2020 regulations. 88 Fed. Reg. 49,924 (July 31, 2023).

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 7

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    circumstances related to the proposed action and if it is within one of the categories established by

2    the Secretary or it is within a category listed in Section 220.6(d) and (e).

3         35.    36 C.F.R. § 220.6(b) lists the resource conditions that should be considered in

4    determining whether extraordinary circumstances related to a proposed action warrant further

5    analysis and documentation in an EA or EIS, including "Federally listed threatened or endangered

6    species or designated critical habitat, species proposed for Federal listing or proposed critical habitat,

7    or Forest Service sensitive species." *Id.* § 220.6(b)(1)(i). According to 36 C.F.R. § 220.6(b)(2), the

8    "mere presence of one or more of the resource conditions does not preclude use of a categorical

9    exclusion; it is the existence of a cause-effect relationship between a proposed action and the

10   potential effect on these resource conditions, and if such a relationship exists, the degree of potential

11   effect of a proposed action on these resource conditions that determines whether extraordinary

12   circumstances exist."

13        36.    36 C.F.R. § 220.6(e) lists the categories of actions for which a project or case file and

14   decision memo are required. One such category is for "timber stand and/or wildlife habitat

15   improvement activities that do not include the use of herbicides or do not require more than 1 mile of

16   low standard road construction." 36 C.F.R. § 220.6(e)(6). Examples include, but are not limited to:

17   (i) girdling trees to create snags; (ii) thinning or brush control to improve growth or to reduce fire

18   hazard including the opening of an existing road to a dense timber stand; (iii) prescribed burning to

19   control understory hardwoods in stands of southern pine; and (iv) prescribed burning to reduce

20   natural fuel build-up and improve plant vigor. *Id.*

21        37.    Forest Service regulations require "scoping" for all Forest Service proposed actions,

22   including those that would be categorically excluded from further analysis and documentation in an

23   EA or EIS. 36 C.F.R. § 220.4(e)(1). "If the responsible official determines, based on scoping, that it

24   is uncertain whether the proposed action may have a significant effect on the environment," the

25   Forest Service must prepare an EA. 36 C.F.R. § 220.4(e)(2). "If the responsible official determines,

26   based on scoping, that the proposed action may have a significant environmental effect," the Forest

27   Service must prepare an EIS. *Id.*

28   //

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 8

1

## Endangered Species Act

2       38.     Congress enacted the ESA "to provide a means whereby the ecosystems upon which

3   endangered species and threatened species depend may be conserved" and to "provide a program for

4   the conservation of such endangered species and threatened species, and to take such steps as may be

5   appropriate." 16 U.S.C. § 1531(b).

6       39.     To achieve these purposes, the Secretaries of Commerce and the Interior are

7   responsible for administering and enforcing the ESA. 16 U.S.C. § 1532(15). The Secretaries of

8   Commerce and the Interior delegated this responsibility to the National Marine Fisheries Service

9   ("NMFS") and the U.S. Fish and Wildlife Service ("USFWS") (collectively, the "Services"),

10  respectively. 50 C.F.R. § 402.02(b). The USFWS administers the ESA as to terrestrial and

11  freshwater species, and NFMS administers the ESA as to marine species.

12      40.     The ESA makes it unlawful to "take" any "endangered" species and certain

13  "threatened" species for which protective regulations have been promulgated. 16 U.S.C.

14  §§ 1538(a)(1), 1533(d).

15      41.     Take means to "harass, harm, pursue, hunt, wound, kill, trap, capture, or collect or

16  attempt to engage in any such conduct" with a listed species. 16 U.S.C. § 1532(19). Harm means "an

17  act which actually kills or injures wildlife. Such act may include significant habitat modification or

18  degradation where it actually kills or injures wildlife by significantly impairing essential behavioral

19  patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

20      42.     An "endangered species" is "any species which is in danger of extinction throughout

21  all or a significant portion of its range . . . ." 16 U.S.C. §1532(6). A "threatened species" is "any

22  species which is likely to become endangered within the foreseeable future throughout all or a

23  significant portion of its range." 16 U.S.C. §1532(20).

24      43.     Section 7 of the ESA imposes substantive and procedural obligations on federal

25  agencies like the Forest Service. Substantively, Section 7 provides that federal agencies must "insure

26  that any action authorized, funded, or carried out by such agency * * * is not likely to jeopardize the

27  continued existence of any endangered species or threatened species or result in the adverse

28  modification of habitat of such species * * * determined * * * to be critical." 16 U.S.C.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

§ 1536(a)(2).

44.     Section 7 requires federal agencies (the "action agency") to engage in consultation with the applicable Service before undertaking a discretionary action that may affect listed species or critical habitat. 16 U.S.C. § 1536(a)(2).

45.     Section 7 consultation is either informal or formal. Informal consultation is a process designed to help the action agency determine whether to engage in formal consultation. 40 C.F.R. § 402.13. If the action agency determines that the proposed action may affect, but is "not likely to adversely affect" ("NLAA") listed species or critical habitat, and the appropriate Service concurs in writing, formal consultation is not required. 50 C.F.R. § 402.14(b)(1).

46.     If the action agency decides that the action may affect, and is likely to adversely affect ("LAA") a listed species, the action agency must engage in formal consultation with the appropriate Service. 50 C.F.R. § 402.14(a). Formal consultation also is required if the consulting agency does not concur in writing with the action agency's NLAA determination. 50 C.F.R. § 402.14(b).

47.     During formal consultation, the appropriate Service must "formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4). The biological opinion ("BiOp") must be based on the best available science and commercial data. 16 U.S.C. § 1536(a)(2).

48.     The BiOp must include: A summary of the information on which the BiOp is based; a detailed discussion of the environmental baseline of the listed species and critical habitat; a detailed discussion of the effects of the action on listed species and critical habitat; and the Service's "jeopardy" opinion. 50 C.F.R. § 402.14(h)(1).

49.     In formulating its "jeopardy" opinion, the Service must, *inter alia*, add the effects of the action and cumulative effects to the environmental baseline. 50 C.F.R. § 402.14(g).

50.     If the Service determines that the action is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," the BiOp must include reasonable and prudent alternatives. *Id.* § 402.14(h)(1)(2).

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 10

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

51. The Service must issue an incidental take statement to the action agency if after formal consultation, the Service concludes that the proposed action will result in take but is not likely to jeopardize a listed species or adversely modify critical habitat. 16 U.S.C. § 1536(b)(4). The incidental take statement must specify: the impact, i.e., the amount or extent, of the incidental taking on the species; reasonable and prudent measures necessary or appropriate to minimize the impact; and terms and conditions that must be complied with by the action agency to implement the specified measures. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i).

52. After the initiation of consultation, the action agency shall not make any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative. 16 U.S.C. § 1536(d).

**Administrative Procedure Act**

53. The APA, 5 U.S.C. §§ 701–706, confers a right of judicial review on any person adversely affected by agency action. The APA provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. The APA also authorizes a reviewing court to compel agency action that is unlawfully withheld or unreasonably delayed. Pursuant to APA § 706(2)(A) and (D), a court must set aside and hold unlawful agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

54. NEPA does not contain a specific private right of action applicable to Plaintiffs' claims for relief. As a result, Plaintiffs' claims are reviewable under the APA.

**FACTUAL BACKGROUND**

55. On October 28, 2022 Defendant Rachel Birkey signed the Decision Memorandum approving the McFarland Fire Recovery Project. The Project is located in the South Fork Management Unit of the Shasta-Trinity National Forest. The Project was approved under CE-6, 36 CFR § 220.6(e)(6).

**McFarland Project Area**

56. The Project area spans 2,138 acres, including over 2,000 acres in the Chanchelulla

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 11

Late-Successional Reserve, a land allocation set aside as habitat for NSO, and 438 acres of riparian reserves, a land allocation set aside for protection of streams and other waterbodies. 2,118 acres in the Project area are designated NSO Critical Habitat. 638 acres of functional NSO Critical Habitat will be "treated," i.e., logged and/or subject to prescribed burning.

57.     In 2021, the McFarland Fire burned approximately 122,000 acres. That fire burned in a mosaic pattern across the majority of the Project area and its critical habitat. According to Forest Service data, 1,048 acres experienced high fire severity (40% of the Project area), 825 acres experienced moderate to low fire severity, and 238 acres experienced very low fire severity.

58.     Before the fire, the Project area included mixed conifer trees in the overstory, and a mix of hardwoods, shrubs, forbs, grasses and groundcover below. Since the 2021 fire, the bulk of the Project area's vegetation is regenerating naturally.

59.     Fires are a natural part of all western forests' lifecycle, including the Shasta-Trinity National Forest. The areas most severely burned by the McFarland Fire were portions of the forest managed as plantations for timber production. More complex (i.e., natural) areas of the forest saw less severe impacts from the McFarland Fire.

60.     Those more complex, less managed forest areas had lower tree mortality—or have since seen natural regeneration—as a result of the low or moderate intensity fire that burned in those areas.

61.     The areas burned most severely in the McFarland Fire provided limited habitat for NSO before the burn, and what remains of the areas that experienced lower-severity fire provided and continues to provide what is left of nesting, roosting, foraging, and dispersal habitat. Further so-called "management" activities in the area will only degrade remaining NSO habitat.

### The Northern Spotted Owl ("NSO") (*Strix occidentalis caurina*)

62.     The NSO is dark brown, mid-sized bird with a barred tail, white spots on its head and breast, and dark brown eyes surrounded by prominent facial discs. Juveniles are identified by the presence of fluffy, cream-colored down feathers (Fig. 1).

63.     NSO are territorial raptors. They are generally monogamous and usually form long-term pair bonds. NSO range widely in search of prey but are "anchored" during the breeding season

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

to a nest site (also referred to as an "activity center"). The 100 acres around this nest site is commonly referred to as the "nest stand."

64.     The area traversed by the individual or pair in its normal activities of food gathering, mating, and caring for young is called the "home range" or "territory", and it generally extends 1.3 miles in all directions (consisting of approximately 1,662 acres) around the nest site or activity center.

65.     NSO show a high fidelity to nest sites. Within the home range, the ½-mile radius area receiving concentrated use, typically surrounding the nest site and favored foraging area, is called the "core" area.

66.     NSO generally rely on older forests (also referred to as mid- to late-successional or mid- to late-seral forests) because such forests contain the structures and characteristics required for nesting, roosting, and foraging. Suitable habitat generally has moderate to high canopy closure (60 to 80 percent); a multi-layered, multi-species canopy dominated by large (>30 inches in diameter at breast height) overstory trees; a high incidence of large trees with various deformities (*e.g.*, large cavities, broken tops, dwarf-mistletoe infections, and other evidence of decadence); numerous large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for owls to fly.

67.     Suitable NSO habitat is generally categorized as either nesting/roosting habitat or foraging habitat, depending on the types of life activities it can support. NSO need sufficient quantities of both nesting/roosting and foraging habitat to survive and reproduce.

68.     The habitat composition within cores and annual home ranges has been found to be directly correlated with demographic response such as occupancy, reproductive success, survival, and fitness. For example, the survival and fitness of northern spotted owls is positively correlated with larger patch sizes or proportion of older forests. Conversely, NSO survival is negatively correlated with forest fragmentation.

69.     NSOs nest, roost and forage in post-fire forest habitat. This habitat, also called "snag forest" habitat, is a complex and important habitat used by numerous small mammals and birds. Predators, including northern spotted owls, seek out these burned areas due to their abundance of

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 13

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

small mammal prey species. Studies in post-fire landscapes have shown that spotted owls use forest stands that have been burned, including high-severity burned forest, but generally do not use stands that have been burned and logged.

70.     Post-fire logging activities, including the felling and removal of live, green trees and hazard trees, as well as salvage logging, reduces or eliminates post-fire habitat. Post-fire logging often targets large living trees, snags, and downed wood. These are all essential habitat elements for the NSO, and all take a long time to develop. Their removal can have significant detrimental ecological effects.

71.     In addition to the direct loss of habitat from the removal of living trees, snags, and downed wood, post-fire logging has a multitude of other detrimental ecological effects on NSO habitat, including: increased erosion and sedimentation; damage to soils and nutrient-cycling processes; reduction in soil-nutrient levels; decreased regeneration of trees; shortening in duration of early-successional ecosystems; increased spread of weeks; damage to recolonizing vegetation; reduction in hiding cover and downed woody material used by spotted owl prey; altered composition of plant species; increased short- and medium-term fire risk; reduction in shading; increase in soil and stream temperatures; and alteration of patterns of landscape heterogeneity.

72.     Survival rates of NSO decrease dramatically when the amount of non-habitat (including non-forest areas and sapling stands) exceeds approximately 50 percent of the home range.

73.     The barred owl is currently displacing the northern spotted owl from historic breeding territories. The extinction (loss of occupancy) probability of pairs of NSO in areas where barred owls are present is triple that of areas where barred owls are not found.

74.     The NSO was listed as "threatened" under the ESA in 1990 due to widespread habitat loss and inadequate existing regulatory mechanisms. Today, many NSO populations continue to decline at a faster rate than anticipated at the time of listing. *See* Designation of Revised Critical Habitat for the Northern Spotted Owl, 77 Fed. Reg. 71,876, 71,878 (Dec. 4, 2012). This continuing decline renders the species highly vulnerable to extinction, as small populations can be wiped out by the genetic effects of inbreeding, a single catastrophic event, or a series of catastrophic events, such as the abnormally severe and frequent wildfires now regularly occurring across the species' range. It

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

is therefore crucial that the remaining pairs of NSO have sufficient habitat to survive and reproduce.

75.     As a result of the NSO's continued decline, in 2020 the USFWS found that the perilous status of the NSO warrants uplisting the species from threatened to endangered. *See* 12-Month Finding for the Northern Spotted Owl, 85 Fed. Reg. 81,144 (Dec. 15, 2020). Managing sufficient habitat for the species now and into the future is therefore vital for its recovery.

76.     The current range of the NSO extends from southwest British Columbia through the Cascade Mountains, coastal ranges, and intervening forested lands in Washington, Oregon, and California, as far south as Marin County. NSO are functionally extirpated or uncommon across areas in the northern portion of its range, making NSO habitat in California critical to the survival and recovery of the species. The USFWS estimates that there are fewer than 3,000 individual NSO across the species entire range.



Figure 1: Juvenile NSO in Burned Nest Patch, Mendocino National Forest

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 15

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

**The McFarland Project**

77.     The Project proposes widespread logging activities targeting live, green trees, snags, and fire-affected trees throughout the Chancellula Late Successional Reserve, and NSO Critical Habitat Unit 11 (Interior California Coast).

78.     To achieve its goals for the Project, the Forest Service proposes designating areas into three different treatment zones, each with its own set of management activities.

79.     The "Fuel Management Zones," which comprise 911 acres of the Project area, encompass areas where McFarland Fire burned with mixed severity. In this zone, the Forest Service proposes the felling and removal of snags, live trees with greater that 70% chance of mortality (according to the agency's internal guidelines), and live, green trees, pruning, burning, removal of underbrush, and other activities in areas extending 200–300 feet from forest roads or ridgelines. The Forest Service proposes these areas to serve as linear fuel breaks to compartmentalize the Project area for purposes of the prescribed fire implementation.

80.     "Heavy Fuel Reduction" (consisting of removal of snags and large and small trees, trimming tree branches, and treatment of small standing and surface fuels) would occur in natural stands where high severity fire occurred, across 240 acres. In this zone, management activities would include the felling and removal of snags and live trees with a 70% or greater chance of mortality.

81.     "Light Fuel Reduction" (consisting of removal of some snags, and smaller diameter trees, as well as pruning and fuel treatment) would occur primarily inside plantations, across 300 acres. In this zone, management activities include treatment of small diameter trees (less than 10 inches diameter at breast height), and felling and removal of snags and live trees with a 70% or greater chance of mortality.

82.     Across the entire Project area, the Forest Service proposes prescribed burning and reforestation, road maintenance, as well as the construction and use of temporary roads and landings (where logs and equipment are placed and temporarily stored).

83.     As originally planned, the Project also included 29 acres of roadside hazard tree logging. This activity was dropped from the Project, however, as it was instead included in the Region 5 Post-Disturbance Hazardous Tree Management project ("R5 Project"). Despite the fact that

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

the impacts of the R5 Project necessarily will be cumulative to the impacts of the McFarland project, as they overlap in both space and time, the final McFarland project documents are silent as to these impacts.

84.     Plaintiffs timely submitted comments on the Project during the single public comment period. Plaintiffs implored the agency to prepare an EIS or EA given the heavy impacts to NSO and other sensitive resources in the Project area.

85.     The Forest Service refused to fully and fairly evaluate the Project's impacts under NEPA, instead approving the Project pursuant to CE-6. In the Decision Memorandum, the agency determined that there were no extraordinary circumstances, including impacts to NSO. The agency attempted to minimize the impacts to NSO, describing "limited potential indirect effects," maintenance of the "functionality of all NSO habitats at current levels of functionality," the "minimi[zation of] the potential for disturbance," and lack of any effect to "reproductive success of any NSO" in the Project area.

## The Biological Opinion and Incidental Take Statement

86.     Pursuant to Section 7 the ESA, 16 U.S.C. § 1536, the Forest Service was required to assess whether the impacts of the McFarland Project were likely to affect NSO, which is a threatened species.

87.     On June 22, 2022, the Forest Service signed its Biological Assessment, concluding that the Project was "not likely to adversely affect" NSO, opining that the Project would "maintain the functionality" of all NSO habitats in the project area."

88.     In the ordinary course, if the expert agency "concurs" with the Forest Service's "not likely to adversely affect" determination, the agencies will engage in "informal consultation" pursuant to Section 7 of the ESA.

89.     The USFWS is the agency with jurisdiction over ESA-listed terrestrial wildlife species, including NSO. The USFWS did not concur with the Forest Service's "not likely to adversely affect" determination. The USFWS communicated to the Forest Service that the Forest Service's "not likely to adversely affect" determination was not consistent with the expected adverse effects of the Project.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 17

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

90.     Thereafter, the agencies engaged in "formal consultation" pursuant to Section 7 of the ESA, culminating, on June 1, 2023, with the USFWS issuance its Biological Opinion and Incidental Take Statement for the McFarland Project.

91.     The USFWS concluded that the Project is "likely to adversely affect" NSO although not to the extent that it would jeopardize the continued existence of the species across its entire range.

92.     The USFWS explained that the Project area and surrounds is important for NSO survival and recovery because it is expected to contribute to a viable source population of NSOs within and outside of the Chanchelulla Late-Successional Reserve.

93.     The Project area and surrounds contains two NSO activity centers. One, "TRI0435" (also called "South Fork Goods Creek") is occupied by a territorial pair. Nesting was successful for the South Fork Goods Creek pair in 2022—post fire—with one young fledged. As the USFWS observed, even though much of the nesting, roosting, and foraging habitat within this pair's home range burned at moderate to high severity, the pair is demonstrating high site fidelity. Nesting also was successful in 2020 and 2021, with two young produced each year.

94.     The USFWS found that the Project activities would adversely affect 84 acres of functional nesting and roosting habitat; 204 acres of foraging habitat; 350 acres of dispersal habitat; and 216 acres of post-fire foraging habitat (Figure 2).

95.     Treatments in these areas, according to the USFWS, would result in the reduced quality and reduction and removal of important habitat elements essential to NSO and their prey.

96.     In sum, the USFWS found that the Project would degrade all remaining nesting, roosting, and foraging habitat in the Project area and in the South Fork Goods Creek core area. The USFWS expected that Project activities would significantly impair breeding, feeding, and sheltering behaviors of NSO and increase the potential for predation of adults and young, and/or increase competitive interactions with barred owls.

97.     The USFWS further found that the overall occupancy and productivity of the South Fork Goods Creek core area is expected to decrease in the short-term due to the project effects that will degrade all remaining nesting, roosting, and foraging habitat within the core area.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

98.     Accordingly, the USFWS concluded that there is reasonable certainty that implementation of the Project would result in the incidental take of all NSO in the Project area, which it determined to be one adult NSO pair and four individual juveniles for a total incidental take of six NSO.



Figure 2: NSO nesting, roosting, foraging, dispersal and post-fire foraging habitat in the Project area, overlaid with treatment zones.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 19

Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. 503-227-2212

**CLAIM FOR RELIEF**

**(Compliance with NEPA and the APA)**

99. Plaintiffs repeat and hereby incorporate by reference the allegations contained in the above paragraphs.

**Count 1: Improper Reliance on Inapplicable Categorical Exclusion**

100. Federal agencies may avoid preparing either an EIS or EA only when the proposed action is "categorically excluded" from NEPA review.

101. The Forest Service promulgated a series of CEs under NEPA regulations that defined CEs as a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4 (2019). When promulgating the regulations, the Forest Service explained that the categories applied to "routine" actions. 57 Fed. Reg. at 43,184.

102. 36 C.F.R. § 220.6(e)(6) applies to projects involving "timber stand and/or wildlife habitat improvement" activities. Examples include activities like girdling trees to create snags, thinning or brush control to improve growth, and prescribed burning.

103. The McFarland Project authorizes over 1,000 acres of commercial logging activities, including salvage logging, and over 2,000 acres of prescribed burning. Such activities are likely to affect threatened NSO, to the degree that "take" of six individuals is reasonably certain to occur on account of significant impairment of feeding and foraging patterns, sheltering behaviors, and adult-provisioning of young.

104. The McFarland Project would degrade, remove, and modify important habitat for one of the few successful breeding NSO pairs on the Shasta-Trinity National Forest.

105. McFarland Project activities would modify and simplify nesting, roosting, and foraging habitat structure by reducing or removing stand complexity and habitat such as canopy closure; large, intermediate, and small sized trees; perch and roost sites; within-stand layering; shrubs and brush; snags; and downed wood.

106. The USFWS determined that most of the Project activities taking place in nesting, roosting, and foraging habitat would have few positive ecological effects, and instead would significantly degrade habitat.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 20

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

107.    Under no reasonable interpretation can the McFarland Project activities be deemed "wildlife habitat improvement" and thus fit under 36 C.F.R. § 220.6(e)(6).  Moreover, commercial logging activities, including salvage logging, and over 2,000 acres of prescribed burning cannot reasonably be interpreted to constitute "timber stand … improvement."

108.    The Forest Service's failure to prepare an EIS or even an EA before authorizing the McFarland Project violates NEPA, and is arbitrary, capricious, an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 2: Extraordinary Circumstances Preclude the Use of a Categorical Exclusion**

109.    Once an agency has determined that a CE may apply, it must then determine whether so-called "extraordinary circumstances" exist which would preclude the use of that CE. *See* 36 C.F.R. § 220.6(a).

110.    Resource conditions that should be considered in this analysis include "Federally listed threatened or endangered species or designated critical habitat[.]"

111.    While the "mere presence of one or more of the resource conditions [such as the threatened NSO] does not preclude use of a categorical exclusion"; "it is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id*.

112.    The McFarland Project would impact NSO to a high degree. Whereas the Forest Service minimized and downplayed impacts to NSO, the USFWS—the expert wildlife agency—disagreed with the Forest Service's conclusions and found substantial adverse impacts to a successful NSO breeding pair to the point where take of six owls is reasonably certain to occur. These impacts are additive to the impacts from the R5 Project, occurring at the same time and place.

113.    The Forest Service's determination that no "extraordinary circumstances" existed even though the Project would result in the take of six NSOs in the Project area, and likely impacts to *all* NSO habitat in the Project area for the length of the Project (up to 20 years), was arbitrary, capricious, an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 21

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

**RELIEF REQUESTED**

WHEREFORE, the Plaintiffs respectfully request the following relief from this Court:

1. Declare the Forest Service has violated the National Environmental Policy Act and its implementing regulations by failing to prepare either an EA or EIS;

2. Declare the Forest Service's approval of the McFarland Project is arbitrary, capricious, an abuse of discretion, not in accordance with, and/or without observance of procedure required by law under the APA, 5 U.S.C. § 706(2)(A), (D);

3. Vacate the DM and remand to the Forest Service for additional consideration;

4. Issue preliminary and permanent injunctive relief prohibiting the Forest Service from authorizing implementation of the McFarland Project until such time as the Forest Service can demonstrate compliance with the requirements of the National Environmental Policy Act, and the Administrative Procedure Act;

5. Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and,

6. Grant such additional relief as the Court deems just and proper.

DATED this 8th day of September, 2023.

_____

René Voss
Oliver Stiefel, *Applicant Pro Hac Vice*
Mike Sargetakis, *Applicant Pro Hac Vice*

*Attorneys for Plaintiffs*

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 22

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*