1   René P. Voss (CA Bar No. 255758)
    Natural Resources Law
2   15 Alderney Road
    San Anselmo, CA  94960
3   (415) 446-9027 ⏐ renepvoss@gmail.com
4   LOCAL COUNSEL

5   Mike Sargetakis (OR Bar No. 174607)
    (503) 233-8044 ⏐ mike@crag.org
6   Oliver J. H. Stiefel (OR Bar No. 135436)
    (503) 227-2212 ⏐ oliver@crag.org
7   Crag Law Center
    3141 E Burnside St,
8   Portland, OR 97214
    LEAD COUNSEL
9   *Pro Hac Vice*

10
    *Attorneys for Plaintiffs*
11

12                  UNITED STATES DISTRICT COURT

13                  EASTERN DISTRICT OF CALIFORNIA

14

15  **SAFE ALTERNATIVES FOR OUR**          No.  2:23-cv-01940-DJC-DMC
    **FOREST ENVIRONMENT**, a California
16  non-profit corporation; **KLAMATH FOREST**   **PLAINTIFFS' REPLY IN SUPPORT OF**
    **ALLIANCE**, a California non-profit    **PLAINTIFFS' MOTION FOR SUMMARY**
17  corporation; and **CONSERVATION**        **JUDGMENT and PLAINTIFF'S**
    **CONGRESS**, a California non-profit     **MEMORANDUM IN OPPOSITION TO**
18  corporation.                             **DEFENDANTS' CROSS MOTION FOR**
                                             **SUMMARY JUDGMENT**
19          Plaintiffs,
                                             Administrative Procedure Act, 5 U.S.C.
20          v.                               §§ 701 *et seq.*)

21  **RACHEL BIRKEY**, in her official capacity as
    Forest Supervisor of the Shasta-Trinity
22  National Forest; and the **UNITED STATES**   Hearing Date:  May 9, 2024
    **FOREST SERVICE**,                      Hearing Time:  1:30 p.m,
23                                           Courtroom 10, 13th Floor
            Defendant.                       Before the Hon. Daniel J. Calabretta
24
    ────────────────────────────────
25

26

27

28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

GLOSSARY OF TERMS ...................................................................................................v

INTRODUCTION ...........................................................................................................1

ARGUMENT .................................................................................................................1

I.      Defendants Have Strained the Plain Language of CE-6 to Incredulity. ...........................1

II.     The Extraordinary Circumstances Determination Was Arbitrary and Capricious...............4

III.    The Forest Service Failed to Properly Consider Significant New Information. .................11

        A.    If There is No New Information, the Decision Must Stand On its Own. .........12

        B.    If There is New Information, The Forest Service Must Supplement its
              Decision Because the New Information is Significant. ...................................12

IV.     Defendants Have Not Provided a Valid Argument for Deviating From Vacatur, the
        Presumptive Remedy in APA Cases. ....................................................................14

        CONCLUSION...........................................................................................................15

**TABLE OF AUTHORITIES**

**CASES**

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*,
  189 F.3d 851 (9th Cir. 1999) ......................................................... 2, 10

*All. for the Wild Rockies v. U.S. Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018) ............................................................ 14

*Anderson v. Evans*,
  314 F.3d 1006 (9th Cir. 2002) .............................................................. 8

*Brower v. Evans*,
  257 F.3d 1058 (9th Cir. 2001) .............................................................. 9

*Ctr. for Biological Diversity v. Illano*,
  928 F.3d 774 (9th Cir. 2019) ............................................................... 9

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ......................................................................... 14

*Conserv. Cong. v. U.S. Forest Serv.*, ("*Conserv. Congress I*")
  No. 2:12-02416 WBS KJN, 2013 U.S. Dist. LEXIS 80136, (E.D. Cal. 2013) ................. 10

*Conserv. Cong. v. U.S. Forest Serv.*, ("*Conserv. Congress II*")
  No. 2:12-02416 WBS, 2016 U.S. Dist. LEXIS 38908 (E.D. Cal. Mar 24, 2016) ........ 10, 13

*Earth Island Inst. v. Hogarth*,
  494 F.3d 757 (9th Cir. 2007) ............................................................... 9

*Earth Island Institute v. Elliott*,
  290 F. Supp. 3d 1102 (E.D. Cal., 2017).................................................... 11

*Envtl. Def. Ctr. v. BOEM*,
  36 F.4th 850 (9th Cir. 2022) ........................................................ 5, 13, 14

*Envtl. Prot. Info. Ctr. v. Carlson* ("*EPIC*"),
  968 F.3d 985 (9th Cir. 2020) ............................................................ 3, 5

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, ("*EPIC*"),
  451 F.3d 1005 (9th Cir. 2006). .......................................................... 3, 5

*Fl. Power & Light Co. v. Lorion*,,
  470 U.S. 729 (1985)......................................................................... 5

*Greater Yellowstone Coal v. Flowers*,
    359 F.3d 1257 (10th Cir. 2004) ............................................................ 8

Humane Soc. Of U.S. v. Locke,
    626 F.3d 1040 (9th Cir. 2010) ............................................................ 14

*Idaho Farm Bureau v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ............................................................ 15

*Idaho Sporting Cong. v. Alexander*,
    222 F.3d 562 (9th Cir. 2000) (*ISC*) ............................................ 12, 13

*Kisor v. Wilke*,
    139 S. Ct. 2400 (2019) ............................................................ 2

*League of Wilderness Defs. v. Peña*,
    No. 3:12-cv-02271-HZ, 2015 U.S. Dist. LEXIS 46279 (D. Or. Apr. 6, 2015) ................ 15

*Los Padres ForestWatch v. U.S. Forest Service*,
    No. cv-22-2781, 2023 U.S. Dist. LEXIS 127627 (C.D. Cal. July 19, 2023) ................ 3

*Mt. Cmtys. For Fire Safety v. Elliott*,
    25 F.4th 667 (9th Cir. 2022) ("*Mountain Communities*") ............................... 3, 4

*NRDC v. Winter*,
    518 F3d 658 (9th Cir 2008) ............................................................ 8

*Neighbors of Cuddy Mountain v. Alexander*,
    303 F.3d 1059 (9th Cir 2002) ............................................................ 12

*Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*,
    981 F.2d 429 (9th Cir. 1992). ............................................................ 1

*Or. Natural Res. Council v. U.S. Bureau of Land Mgmt.*,
    470 F.3d 818 (9th Cir 2006) ............................................................ 12

*Or. Natural Desert Ass'n v. Zinke*,
    250 F. Supp. 3d 773 (D. Or. 2017) ............................................................ 15

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*
    265 F.3d 1028 (9th Cir. 2001) ............................................................ 8

*Pollinator Stewardship Council v. E.P.A.*,
    806 F.3d 520 (9th Cir. 2015) ............................................................ 14, 15

*Sec. & Exch. Comm'n v. Chenery Corp.*,

 318 U.S. 80 (1943) ......................................................................................... 12

Sierra Forest Legacy v. Sherman,

 951 F. Supp. 2d 1100 (E.D. Cal. 2013) ........................................................... 14

*Tri-Valley CAREs v. U.S. DOE*,

 671 F.3d 1113 (9th Cir. 2012) .............................................................. 5, 8, 12

*United States v Hardmand*,

 297 F.3d 1116 (10th Cir. 2002) ....................................................................... 12

**STATUTES**

Endangered Species Act
16 U.S.C. § 1532(2) ......................................................................................... 10

**REGULATIONS**

US Forest Service NEPA Regulations
36 C.F.R. § 220.6(b)(2) .......................................................................................... 8
36 C.F.R. § 220.6(c) ................................................................................... 5, 6, 9
36 C.F.R. § 220.6(e)(6) ..................................................................................... 1, 4
36 C.F.R. § 220.6(e)(6)(i) ..................................................................................... 3

Council on Environmental Quality NEPA Regulations
40 C.F.R. § 1501.3(b)(1) ......................................................................................... 8
40 C.F.R. § 1501.5(1)(2) ....................................................................................... 10
40 C.F.R. §1502.9(d)(1)(ii) ................................................................................... 14
40 C.F.R. § 1507.3 ............................................................................................... 2
40 C.F.R. § 1508.4 ........................................................................................... 2, 4
40 C.F.R. § 1508.1(g)(1), (2) .................................................................................. 7

US Fish and Wildlife Service Regulations
50 C.F.R. § 17.3 ............................................................................................... 7, 8
50 C.F.R. § 402.02 .......................................................................................... 7, 8
50 C.F.R. § 402.13(c) ......................................................................................... 10
50 C.F.R. § 402.16(a)(2) ....................................................................................... 14

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BiOp | Biological Opinion and Incidental Take Statement |
| CC | Conservation Congress |
| CEQ | Council on Environmental Quality |
| Defendants | Rachel Birkey and United States Forest Service |
| Decision or DM | Decision Memorandum |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| Forest Service or agency | United States Forest Service |
| KFA | Klamath Forest Alliance |
| LAA | Likely to Adversely Affect |
| NEPA | National Environmental Policy Act |
| NRF | Nesting, Roosting and Foraging (Habitat) |
| NLAA | Not Likely to Adversely Affect |
| Owl or NSO | Northern spotted owl |
| Project | McFarland Project |
| SAFE | Safe Alternatives for our Forest Environment |
| USFWS | United States Fish and Wildlife Service |
| APA | Administrative Procedure Act |

**INTRODUCTION**

Plaintiffs brought this suit to hold the Forest Service accountable for violations of NEPA, where the agency has authorized a project under a CE despite the reasonable certainty of take of six ESA-listed owls. Rather than addressing many of the legal arguments presented in Plaintiffs' Opening Brief ("Op.," Dkt 23-1), Defendants inaccurately re-frame Plaintiffs' case, and then summarily declare it "doom[ed]." Defendants' Opening/Response ("Resp.," Dkt 25-1) at 8, 20. Defendants' hyperbole notwithstanding, they have pointed to no case where a court has upheld the use of a CE in light of a project's take of ESA-listed species.[1]

Because this appears to be a case of first impression, the facts and legal issues in this case are unique. But they are straightforward. This case does not ask whether the Forest Service can implement this Project; this case asks whether the agency conducted the appropriate level of analysis for a project that is reasonably certain to take six imperiled owls. The three legal claims presented all get to this fundamental question: (1) did the agency improperly authorize the Project under the "wildlife habitat improvement" CE when it will cause habitat degradation to the degree it will take a listed species? (2) Did the agency fail to adequately account for the reasonably foreseeable impacts described by the expert wildlife agency when it determined the Project will cause no extraordinary circumstances? (3) Did the agency fail to properly account for significant new information after the final decision? By improperly relying upon extra-record materials and counsel's post hoc rationalizations that are inconsistent with the Decision, Defendants try to reframe and confuse the facts and the core legal issues. But a careful review of the law and the record rebut Defendants' characterizations that the Project's impacts will be minimal and that a CE is the appropriate level of environmental review.

**ARGUMENT[2]**

**I.   Defendants Have Strained the Plain Language of CE-6 to Incredulity.**

36 C.F.R. §220.6(e)(6) permits "timber stand and/or wildlife habitat improvement activities" in certain situations. CE-6 does not define "wildlife habitat improvement," but the

---

[1] This brief uses the same citation conventions as the Opening Brief. *See, e.g.*, Op. at 2 n.1.
[2] Defendants do not contest Plaintiffs' standing to bring this case and have thus waived any such challenge. *See Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 436 (9th Cir. 1992).

regulatory term "improvement" must have meaning. Defendants buck any notion of ambiguity in CE-6, and ask this Court to "begin and end its analysis with the plain meaning of the regulatory text." Resp. at 10. The language of CE-6 and its examples are of no assistance to Defendants. Moreover, Defendants brush past the fact that, to "exempt classes of actions" under a CE, an agency must explicitly find—in notice and comment rulemaking—that such actions do not individually or cumulatively have significant effects. 40 C.F.R. §§ 1507.3, 1508.4 (2019).[3] Here, no such determination was made for the scope and scale of activities authorized by the Project, which activities will degrade habitat to the degree it will take six owls. Interpreting CE-6 to allow such a Project cannot be squared with the text, structure, history, and purpose of the regulation and is arbitrary and capricious. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2419 (2019); *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 (9th Cir 1999).

Defendants acknowledge that the Project will result in degradation of wildlife habitat in the Project area. Resp. at 13. However, they argue that "degrade" actually means "improve," a position unsupported by law or the Record. *Id.* Defendants cite a definition for a compound term "degrade/maintain," used in the Biological Assessment for the notion that "degrade" means "improve." *See* Resp. at 13 (citing AR2768 ("To '**degrade/maintain**' means the effects are minimal and the habitat will remain functional[.]" (emphasis in original)). The inclusion of the word "maintain" in that definition modifies what is being defined in that phrase beyond the word "degrade" used on its own. A more accurate definition of the word "degrade" as it is used in the context of owls and owl habitat management is the one provided in the BiOp.

> The term *degraded* describes the effect when treatments have a **negative influence** on the quality of habitats known to be used by NSOs by removing or reducing the habitat elements, but not to the degree that the pre-treatment habitat function changes. For example, foraging habitat remains foraging habitat and NR habitat, but with reduced quality. . . Degraded conditions **can potentially lead to adverse effects**. . . especially when this effect occurs at a moderate to large scale, in a continuous area. . . or in important habitat areas.

AR2581 (emphasis added in bold, italics in original). This more specific definition matches the actual scope of impacts found by the expert wildlife agency, namely, that while certain habitat

[3] Defendants ignore that it is the previous version of the CEQ regulations that is relevant to this issue, as CE-6 was adopted pursuant to that version. *See* Op. at 4.

components would not be downgraded or removed, they would still be adversely affected on account of the "combined project effects at a landscape scale[.]" AR2586. Thus, to the extent that Defendants rely on descriptions of "degraded" habitat in the BiOp to mean "improved," this Court should disregard those assertions, because the Fish and Wildlife Service clearly defines "degrade" to describe adverse impacts. AR2598 (citing as one basis for its LAA/take determination the 84 acres of NR habitat degraded by the Project).

Perhaps more importantly, Defendants ignore that the Project also will *remove* 143 acres of post-fire foraging habitat. AR2598; *see also* AR2581–82 ("removed" means when treatments remove and reduce habitat elements to the degree habitat no longer functions). Under no reasonable interpretation can the removal of habitat for an ESA-listed species be considered "improvement." *Cf. Envtl. Prot. Info. Ctr. v. Carlson* ("*EPIC*"), 968 F.3d 985, 990 (9th Cir. 2020). Such removal comes in the form of the Project's "salvage" logging activities, which are disconnected to any of CE-6's listed examples. *See* Op. at 17. Moreover, the Fish and Wildlife Service discounted any possible benefits for owl habitat from salvage logging. AR2588 ("the effects of salvage harvest has both negative short- and long-term effects to NSO habitat due to the removal of essential habitat components (e.g. large snags and coarse woody debris).").

Defendants claim that the Ninth Circuit rejected the idea that salvage logging is inappropriate under CE-6. Resp. at 12 (citing *Mt. Cmtys. For Fire Safety v. Elliott*, 25 F.4th 667, 676 (9th Cir 2008), and *Los Padres Forest Watch v. U.S. Forest Serv.*, No. cv-22-2781, 2023 U.S. Dist. LEXIS 127627 at *8-9 (C.D. Cal. July 19, 2023) [on appeal, No. 23-55801]). But these cases do not deal with salvage logging, and the Court made no such holding in either case.[4] Defendants also claim that CE-6's example of "girdling trees to *create* snags," 36 C.F.R. § 220.6(i) (emphasis added), supports their interpretation of CE-6 covering salvage logging. But salvage logging *removes* snags from the forest—precisely the opposite of *creating* snags.

Finally, Defendants fall back on the notion that the possible long-term benefits of the

---

[4] The project in *Mountain Communities* involved thinning of live trees for timber stand improvement. 25 F.4th at 672–73. The project in *Los Padres* apparently authorized the cutting of dead trees in certain circumstances. Importantly 88% of the project fell under *two other, statutory* CEs. 2023 U.S. Dist. LEXIS at *9. Thus, the cutting of dead trees approved under CE-6 appears to have been limited, and was not salvage logging.

Project outweigh any short-term impacts, selectively citing the BiOp. Resp. at 14. They fail to disclose that the Fish and Wildlife Service also found adverse long-term impacts. AR2583 (habitat function degraded for 20 years), 2588 ("In the long-term, the removal of large dead, dying, and fire damaged trees and the creation of openings may delay or preclude future stand development."). Ultimately, Defendants try to "divide and conquer" the different treatments, some of which may have isolated benefits,[5] but they ignore that the "continuous and compounding" nature of the activities "result in a greater accumulated impact to NSO habitat and their prey than the individual treatments alone. AR2583, 2585 (Figure 4).[6]

Defendants also fail to acknowledge that balancing short- versus long-term effects is unmoored to the regulatory purpose and history of CE-6. *See* Resp. at 12–13 (section purportedly addressing the "purpose and history" of CE-6 but focusing exclusively on the Project record). Nowhere in the rulemaking for CE-6 did the Forest Service make a determination that short-term impacts to a listed species from thinning, salvage logging, or any other timber harvest activity would not be individually or cumulatively significant, a point unrebutted by Defendants. 40 C.F.R. § 1508.4 (2019); Op. at 17–18.

Nothing about the text, structure, history, or purpose of CE-6 shows that a Project that would "affect all of the residual NRF available in the project area," AR2599, to the degree that it will take six owls, AR2603, somehow constitutes "wildlife habitat improvement." Accordingly, the Project cannot reasonably fit under CE-6's plain text. Moreover, if this Court finds CE-6 ambiguous, it should accord no deference to the agency's interpretation; regardless of whether it is an "authoritative" interpretation, Resp. at 14–15, it fails the *Kisor* test.

## II. The Extraordinary Circumstances Determination Was Arbitrary and Capricious.

Without citation, Defendants incorrectly argue that the "standard for a CE is . . . no

---

[5] For example, the only long-term benefit found by the Fish and Wildlife Service was in the "western portion [of the project area] that primarily consists of non-habitat for NSO." AR 2583.

[6] The degradation of nesting/roosting habitat stems from the Project's thinning and underburning activities. AR2585–86. As Plaintiffs explained, while these two activities resemble two of CE-6's examples, they still must be viewed in the context of the regulation itself: "timber stand and/or wildlife habitat *improvement*." 36 C.F.R. § 220.6(e)(6) (emphasis added). This case therefore differs from *Mountain Communities* in that the live-tree thinning here is not "improvement." *See* Op. at 16 (citing 25 F.4th 667). The same is true for underburning, which, while potentially beneficial as a stand-alone treatment, combines with the other treatments to lead to an overall reduction in habitat quality. AR2587.

'significant' adverse effects as defined by NEPA." Resp. at 15–16. But the standard for a full *EIS* is whether there are substantial questions raised as to whether there *may* be significant effects, which itself is a "low" bar. *Envtl. Def. Ctr. v. BOEM*, 36 F.4th 850, 878–879 (9th Cir. 2022). Legally (and logically) the standard for whether extraordinary circumstances exist that preclude the use of a CE (such that at least an *Environmental Assessment* is required) dictates a lesser showing. Indeed, CEs are reserved for activities that have a "minimal impact on the environment." *EPIC*, 968 F.3d at 990. The regulations provide that an EA must be prepared if "it is uncertain whether the proposed action may have a significant effect on the environment," 36 C.F.R. § 220.6(c), *accord* AR2883—a standard Defendants neglect to mention. That threshold is easily crossed here. In arguing otherwise, Defendants obfuscate the record and cite inapposite caselaw. Critically, they fail to cite a single case where a court has upheld a no extraordinary circumstances determination in light of take of an ESA-listed species.

As to the record, Defendants cobble together citations in an effort to show the Forest Service evaluated the full degree of effects, including by citing post-decisional information. *See, e.g.*, Resp. at 15 (citing AR7–15), 16 (citing AR54–57), 17 (citing AR8, 56), 18 (citing AR8–11).[7] But the Decision does not once mention the fact that the Project will cause take of six owls. Nor does the BA. It is therefore impossible to conclude from the record (appropriately cabined by the bar on post-decisional information) that the Forest Service decided that there was no uncertainty over the degree of impacts despite the take of six owls. Defendants' allegation that the Forest Service "reasonably determined" that take is not an extraordinary circumstance, Resp. at 16, is simply unsupported by the administrative record that existed at the time of the decision. This Court should hold unlawful and set aside the Decision on this ground alone. *See Fl. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

Defendants cherry pick a handful of facts they contend demonstrate agreement between

---

[7] "Post-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision[.]" *Tri-Valley CAREs v. DOE*, 671 F.3d 1113, 1131–32 (9th Cir. 2012); *see also infra* at 12–14.

the agencies about the degree of effects, based principally on the Biological Assessment. Resp. at 18–19. It is worth highlighting that the analysis and conclusions reached in the BA were found to be inadequate. In the BA, the Forest Service made a "Not Likely to Adversely Affect" determination. AR2780. Based on consultation, the Forest Service changed its mind regarding the impacts, conceding a "Likely to Adversely Affect," but without any reference to the BA's incorrect determination, or any explanation as to this change in determination. AR26. This unexplained change on its own should demonstrate sufficient uncertainty around Project impacts to preclude the use of a Categorical Exclusion. 36 C.F.R. §220.6(c).

One cannot read the BA and BiOp side by side and conclude that they disclose the same degree of effects. For example, the Fish and Wildlife specifically criticized the BA and its use of a methodology for evaluating impacts that is out of step with the best available science. *Compare* AR2768–69 (BA disclosing "relatively limited" habitat impacts because, inter alia, Project activities will affect 49 acres of NR within a circular core area) *with* AR2603, 2598 (BiOp criticizing the use of a concentric circular area and focusing instead on the degradation of 84 acres of NR habitat). Moreover, the record shows a considerable disagreement between the agencies about impacts to post-fire foraging habitat. *Compare* AR2741 (BA citing as one basis for its "limited" potential adverse effects conclusion the fact that post-fire foraging areas will retain high levels of coarse wood and potential perch trees) *with* AR2598, 2589 (BiOp disclosing removal of 143 acres of post-fire foraging habitat and discussing adverse consequences).

As one final example, Defendants' attempt to downplay the Project's effects on owls because they are allegedly "short-term" and "indirect." Resp. at 1, 5, 7, 14, 15, 16, 18; *see also* AR36 ("limited potential indirect effects"). Such characterizations simply cannot be squared with the determinations of the expert wildlife agency. In the BiOp, the Fish and Wildlife Service thoroughly catalogued not only the effects from the Project, but also the Forest Service's consistent attempts to downplay those effects. AR2530–31 (consultation history). Resp. at 18 (citing AR2759). The Fish and Wildlife Service did not agree that the effects will only be indirect or that they would only be short-term. AR2599 ("These direct and indirect impacts to NSOs and their individual prey and prey populations throughout the project area will be most significant

over the first 1–5 years of treatment."); AR2587 ("The removal of these essential features delays the recovery of NRF habitat types, and may have adverse impacts to individuals attempting to occupy these areas in both the short- and long-term.").

Defendants apparently seize on the fact that the Fish and Wildlife Service determined that no "direct injury" to owls would occur, but fail to acknowledge that such an injury—the potential for nesting owls to be hit be falling trees during harvest—is "rare." AR2580. And Defendants fail to link "direct injury" with "direct effect." There can no dispute that that the Project's impacts on owls are caused by the timber harvest activities; habitat modification in this regard, whether labeled a "direct" or "indirect" effect, will adversely impact owls. AR2598 (project effects "are expected to impair breeding, feeding, and sheltering . . . [and] increase the potential for predation of adults and young, and/or increase competitive interactions with barred owls"); *cf.* 50 C.F.R. § 402.02 (Fish and Wildlife Service regulations defining "effect" and not distinguishing between direct and indirect effects, but rather, whether an action is a "but for" cause).[8]

Relatedly, Defendants posit that "the Project will not kill Owls," and dismiss the extent of the impacts described in the Incidental Take Statement, straining towards framing those impacts into a mere hypothetical. Resp. at 1. Defendants may disagree with the issuance of an Incidental Take Statement, but they are bound by it. The Fish and Wildlife Service expressly found that:

> degradation, removal, and modification of habitat and continuous spatial extent of the effects of the proposed action is expected to **significantly impair the breeding, feeding, and sheltering behavior of the adult owls and their young**. . . . Despite seasonal restriction[s on Project activities] adult provisioning of young during the nesting season and the feeding behaviors of juveniles after the nesting season are expected to be significantly impaired.

AR2604 (emphasis added). Nowhere does the Fish and Wildlife Service guarantee that the Project will not result in the death of any of the six owls. While the possibility of "direct injury" is unlikely, habitat modification, by definition, only rises to the level of take where it "actually kills or injures wildlife." 50 C.F.R. § 17.3 (definition of "harm"). As a matter of law, this is an

---

[8] In any event, Defendants' minimization of "indirect" finds no support in the CEQ regulations or caselaw. Under NEPA, "direct effects are those that "are caused by the action and occur at the same time and place," while "indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. §1508.1(g)(1), (2). Both must be fully accounted for. *Id.*

outcome "reasonably certain to occur." 50 C.F.R. § 402.02.[9]

As to the law, Defendants artificially inflate the burden for showing extraordinary circumstances, arguing that Plaintiffs must prove a significant impact to the entire species. Resp. at 24. Defendants seize on the fact that the Fish and Wildlife Service determined that the Project would not jeopardize the continued existence *of the species as a whole* or adversely modify its *entire* critical habitat. AR2604. But "an agency action can have 'significant effects' on the environment short of threatened extinction." *NRDC v. Winter*, 518 F3d 658, 692 (9th Cir 2008) (*rev'd on other grounds*); *see also Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1275 (10th Cir 2004) (regarding as not determinative for NEPA purposes the Fish and Wildlife Service's "no jeopardy" opinion). Indeed, the agency may not adopt an analytical scale so large that it marginalizes the site-specific impact of the activity on ecosystem health. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036–37 (9th Cir. 2001).

Rather, the Forest Service must address the degree of impacts to the owls within the Project area. 36 C.F.R. §220.6(b)(2); *Anderson v. Evans*, 314 F.3d 1006, 1019 (9th Cir. 2001) (focus is whether the action may significantly affect the environment in the local area); *see also* 40 C.F.R. § 1501.3(b)(1) (must consider local area). The Record is clear that this Project will lead to the take of the nesting pair of owls in the Project area, as well as two generations of their young. The impacts to owls in the Project area could not be more severe. *Cf.* AR2595 (discussing the importance of this reproducing pair, a "high priority for conservation," a fact not disclosed in the BA); AR2567 ("The action area, despite its small size and limited NRF habitat, is considered important for NSO survival and recovery because it is expected to contribute to a viable source population of NSOs within and outside of the LSR.").

Defendants cite internal agency guidance on the interplay between effects determinations

---

[9] Defendants also inappropriately cite the Forest Service's internal survey data to posit that the area's known breeding pair has fled the project area, and claim this fact is one that again "dooms" Plaintiffs' lawsuit. Resp. at 2. This post-decisional information is irrelevant to the extraordinary circumstances determination. *Tri-Valley CAREs* 671 F.3d at 1130. Even taken as true, however the fact that the owl pair may have had to flee its prior nesting area could be attributed to the ongoing Project activities, and itself constitute "harm." *Compare* 50 C.F.R. §17.3 (defining "harm" under "take" as an act which "significantly impair[s] essential behavioral patterns, including breeding, feeding or sheltering.") *with* AR2603 (Incidental Take Statement noting that "owls may shift their foraging or roosting patterns or nest patch locations to avoid treated areas."); *see also infra* at 13-14.

under the ESA and NEPA, but those memoranda are not dispositive. A 2014 memo explains that a "Not Likely to Adversely Affect" determination is the appropriate conclusion when effects on listed species are expected to be discountable, or insignificant, or completely beneficial." AR3343–44. Setting aside whether such a position would survive judicial review in all instances, *see* Op. at 19–20, it does not address the situation here: LAA, with take. A 2018 memo posits that there can be incidental take when doing a CE, AR2876, but fails to cite any caselaw in support of this position. The 2018 memo does make clear, however, "it is essential to explain the underlying rationale supporting" the determination made. AR2784. As explained, neither the Decision nor BA actually grapple with the take determination.

At the very least, a CE is inappropriate if there is any uncertainty about the degree of impacts. 36 C.F.R. § 220.6(c). Here, an irreconcilable gap exists between the Forest Service's conclusory statements about the impacts and the Fish and Wildlife Service's detailed analysis and description of the "take" of six owls. *Compare, e.g.*, AR36 ("limited *potential* indirect effects*") with* AR2605 (Project activities are "reasonably certain to impede feeding and foraging patterns, sheltering behaviors, and provisioning of young."). Defendants posit that the agency's "expertise makes it uniquely qualified to determine whether the degree of potential adverse effects" creates an Extraordinary Circumstance. Resp. at 19. But, as here, "[t]he presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001). Agency action is arbitrary and capricious when the agency has failed to articulate a "rational connection between the facts found and the determination made." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 766 (9th Cir. 2007). The Forest Service's attempt to simply brush aside the findings and conclusions of the expert wildlife agency is arbitrary and capricious.

Defendants next cite a litany of cases which either discussed sufficiency of *Environmental Assessments* (not CEs), or which challenged sufficiency of analysis in regard to impacts to *sensitive* species. Resp. at 17 (citing, *inter alia*, *Ctr. for Biological Diversity v. Illano*, 928 F.3d 774 (9th Cir. 2019)). These cases are inapposite for two reasons: First, where an agency has prepared an EA, it has considered alternatives to the proposed action and analyzed impacts in

a fundamentally different way than with a CE. *See* 40 C.F.R. §1501.5(1), (2). One result of a finding of extraordinary circumstances is the preparation of an EA, AR2883; the two are simply not interchangeable levels of analysis. *Cf. Alaska Ctr.*, 189 F.3d at 859 ("Categorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment."). Second, sensitive species, by definition, are *not* threatened with extinction. *Compare* AR91 (sensitive species are those for which population viability is a "concern" and management efforts are taken to prevent a "trend" toward ESA listing) *with* 16 U.S.C. § 1532(2) (defining "threatened species" as one which is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range").[10] Given this lack of direct support from the caselaw, Defendants are forced to dwell on hyper-technical distinctions with the cases cited by Plaintiffs.

Defendants pounce on the 2016 *post-remand* Decision in *Conservation Congress v. USFS*, No. 2:12-02416 WBS, 2016 U.S. Dist. LEXIS 38908 (E.D. Cal. Mar 24, 2016) ("*Conserv. Congress II*"), positing that the 2016 Decision "essentially" overrode the original ruling from the 2013 case. Resp. at 20. But the additional, post-remand facts render *Conserv. Congress II* inapposite. After this Court in *Conserv. Congress I*, No. civ. 2:12-02416 WBS KJN, 2013 U.S. Dist. LEXIS 80136 (E.D. Cal. June 5, 2013), issued an injunction, the Forest Service submitted a detailed declaration, explaining how the project actually would benefit the owl, and the court lifted the injunction based on the new justification. *Conserv. Congress II*, 2016 U.S. Dist. LEXIS 38908, at *3. This case, however, remains analogous to the pre-remand 2013 circumstances in *Conserv. Congress I*, where this Court found the no-extraordinary-circumstances determination unsupported by the record. *See* Op. at pp.19–20 (citing *Conserv. Congress I* and *Defenders of Wildlife v. USFS*, Dkt. 23-2 at 77–93). More importantly, however, Defendants fail to reconcile the dispositive distinction between those cases and the instant one: NLAA versus LAA. That is a critical distinction because for an NLAA determination, like in *Conserv. Congress I & II*, the expert wildlife agency *concurs* in that determination, 50 C.F.R. § 402.13(c), which is the exact

[10] The cases are factually inapposite, too. For example, in *EPIC v. USFS,* the take at issue was based on *extrapolations* of suitable habitat, not impacts to a known breeding pair. 451 F.3d 1005, 1010 (9th Cir. 2006).

opposite of what occurred here. AR2520. [11]

Defendants also cite *Earth Island Institute v. Elliott*, for the proposition that an LAA determination does not present an extraordinary circumstance, Resp. at 20–21 (citing 290 F. Supp. 3d 1102, 1118–22 (E.D. Cal., 2017)), challenging plaintiffs' assertion that its counsel was unaware of any case which supported the facts in the case at hand, *i.e.*, a case where a court had upheld the use of a categorical exclusion when formal consultation resulted in an Incidental Take Statement. Op. at 20–21. While counsel's framing may have been a bit inartful, Defendants have failed to point to contrary authority. Indeed, *Elliott* is inapposite. That case—which denied a preliminary injunction, was not decided on the merits at the district court, and which had its appeal dismissed as moot and therefore not resolved on the merits on appeal, 775 Fed. App'x 312—involved a LAA determination for a species which the Fish and Wildlife Service could not even confirm *existed* in the project area. 290 F. Supp 3.d at 1109 ("The project area contains no documented MYLF populations and no critical habitat. . . populations known to exist . . . are more than 20 miles away"). The Fish and Wildlife Service did not issue an Incidental Take Statement in that case. This stands in contrast to the case at hand, where the Record demonstrates years of pre- *and* post-fire breeding owls nesting in the Project area, and the Fish and Wildlife Service has predicted take of six owls.

In sum, Plaintiffs are not advocating from a rote "LAA=Extraordinary Circumstances" bright line. *Contra* Resp. at 17. Rather, they argue that the take of a reproductive pair of owls and two years of their offspring—a fact unaddressed in the Decision or BA—requires at least an EA.

### III.   The Forest Service Failed to Properly Consider Significant New Information.

Either there exists new information related to the McFarland Project and its impacts that has come to the Forest Service's attention after October 28, 2022, or not. If there is no new information, then the Decision must stand on its own, and any effort to prop up the Decision using information coming into existence after October 28, 2022 constitutes improper post hoc

---

[11] While Defendants liken the post-decisional records at AR1–11 and 54–57 to the *post-remand* proceedings in *Conserv. Congress* II, this Court should reject such an apples-to-oranges comparison. If the Forest Service wants to attempt to cure the deficiencies of the DM *on remand*, it is free to do so.

rationalization of Defendants' actions.[12] If there is new information that has come to exist since October 28, 2022, the Forest Service must address that information and supplement its Decision and its underlying analysis because such information is "significant."

**A.**      **If There is No New Information, the Decision Must Stand On its Own.**

Defendants take the position that the Biological Opinion and Incidental Take Statement present no new information, and as a result, there was no need to supplement the McFarland Decision. AR1; Resp. at 22–24. This position is undercut by the analysis (or lack thereof) in the Decision related to the specific information about impacts to owls and owl habitat presented in the Biological Opinion, and even the 7(d) letter. *Contra* Resp. at 5, 22–23. If that assertion is taken to be true, however, any information in the Record that comes after the Decision is merely post-hoc rationalization, and cannot be advanced to support the Decision. *Tri-Valley CAREs*, 671 F.3d at 1130–31; *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("We merely hold that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."). Defendants rely on the New Information Memorandum, AR1–11 to rationalize why the information was not new, but stretch such a memo beyond its breaking point. *See Idaho Sporting Cong., Inc. v. Alexander* ("*ISC*"), 222 F.3d 562, 566 (9th Cir. 2000). The memo is not limited to discussing the temporal scope of the information; it is the sole source of the agency's rationalizations about the take determination. *See supra* at 5. Because the memo is being used to present information that the agency was required, but failed to include in the underlying analysis, it is improper. *See ISC*, 222 F.3d at 566–67 (agency is not permitted to correct deficiencies by such means).

**B.**      **If There is New Information, The Forest Service Must Supplement its Decision Because the New Information is Significant.**

If, on the other hand, the information is new, then the Forest Service was required to

---

[12] Related to the issue of new information, Defendants glance towards a position that Plaintiffs' claims are moot, relying inapplicable case law. Resp. at 12 n.5. This Court need not consider a substantive argument raised only in a footnote. *See United States v Hardmand*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."). In any event, this case is not moot. There remains federal action to occur and there is no information which would indicate that there is no available remedy to Plaintiffs' harms. *See, e.g., Or. Natural Res. Council v. BLM*, 470 F.3d 818, 821 (9th Cir 2006) ("an appropriate [Environmental Assessment] can yet yield effective post-harvest relief" for challenges to a timber harvest project); *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1065–66 (9th Cir 2002) (Court may order agency to adjust future timber plans to compensate for allegedly unlawful one.).

supplement the analysis. Given the vast differences in the accounting of impacts between the Forest Service's Decision and the Fish and Wildlife Service's BiOp, the Forest Service cannot simply declare the information from the BiOp to have been considered, and move on without addressing it in a new analysis. *Compare* AR26 ("LAA") *and* AR36 (describing "no uncertainty" with regard to impacts, describing "potential and temporary shifts in foraging patterns of NSO. . . not expected to affect reproductive success[.]") *with* 2780 ("NLAA") *and* AR2598 (project effects "are expected to impair breeding, feeding, and sheltering behaviors of the northern spotted owls that occupy these areas, increase the potential for predation of adults and young, and/or increase competitive interactions with barred owls"); *see also supra* at 8-9; *contra Conserv. Congress II*, (post-remand explanation confirmed original NLAA finding);

Whether or not the determination of take for a reproductive pair of owls "may" be significant is precisely the type of analysis that should occur in an open and transparent NEPA process, with public comment and expert analysis. *See ISC*, 222 F.3d at 567 (noting NEPA's "action-forcing" procedures and rejecting post-decisional analysis); *cf. Envtl. Def. Ctr. v. BOEM*, 36 F.4th 850, 878 (9th Cir. 2022) ("well-established" that agency action "must be upheld, if at all, on the basis articulated by the agency itself," and not counsel's post hoc rationalization).

Finally, while arguing that no significant post-decision information exists, Defendants rely on post-decisional information in support of a position that the nesting pair of owls has moved outside of the Project area. Defendants seize on this fact in an attempt to downplay the Project's impacts. Resp. at 16. But this fact only underscores the need for additional NEPA analysis. Defendants neglect to mention that the Fish and Wildlife Service predicted this outcome: "The adverse effects from the project may result in NSOs shifting their nest locations, which will likely result in NSOs modifying their foraging and sheltering patterns." AR2600. Defendants claim that the relocation "was most likely caused by the Fire itself, and not by Project activities," Resp. at 16, but this is precisely the type of post-hoc rationalization upon which this Court may not rely. *See Envtl. Def. Ctr. v. BOEM*, 36 F.4th at 878.[13] Importantly, the post-

---

[13] To support its position in part, Defendants cite an extra-record declaration, Dkt 25-2 McElroy Declaration, which this Court should also disregard. *See* Pls. Motion to Strike (filed concurrently).

decisional survey data, AR54–57, has never been vetted by the Fish and Wildlife Service, including as to its implications. Defendants concede that "it is too soon to know if this Owl pair will nest in their new location outside the project area in 2024," Resp. at 8, meaning, of course, that the owls could return. Whatever the case, if the Forest Service believes this new information to be so critical, it must reinitiate consultation, 50 C.F.R. §402.16(a)(2) (Consultation must be reinitiated under the ESA when "new information reveals effects of the [agency] action that may affect listed species or critical habitat in a manner or to an extent not previously considered"), and prepare a supplemental NEPA analysis. 40 C.F.R. § 1502.9(d)(1)(ii). In sum, none of the post-decisional information Defendants rely on has been vetted in accordance with NEPA's procedural safeguards, and is not memorialized in its Decision.

### IV.   Defendants Have Not Provided a Valid Argument for Deviating From Vacatur, the Presumptive Remedy in APA Cases.

Vacatur is the "presumptive" remedy for unlawful agency actions, *see, e.g.*, *All. for the Wild Rockies v. U.S. Forest Service,* 907 F.3d 1105, 1121–22 (9th Cir. 2018), and remand without vacatur is permitted only in "limited," "rare" circumstances. *Pollinator Stewardship Council v. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015); *Humane Soc. Of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). Because vacatur of an unlawful agency action is the presumed remedy, courts "leave an invalid rule in place only when equity demands that [they] do so." *Pollinator Stewardship*, 806 F.3d at 532. That vacatur is the presumptive remedy is taken directly from the plain language of the APA (5 U.S.C. § 706(2) ("*shall*….set aside…unlawful agency action"), and the principle that agency action taken in violation of the APA "cannot be afforded the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979).[14]

Defendants confuse vacatur with injunctive relief. Unlike an injunction, vacatur simply sets aside the agency action the Court has held unlawful, resetting to the *status quo ante*. To obtain vacatur, a party need not meet the standards for injunctive relief. *See Envtl. Def. Ctr. v. BOEM*, 36 F.4th at 882; *contra* Resp. at 25 (citing standard for permanent injunction). It is

---

[14] Defendants cite *Sierra Forest Legacy v. Sherman*, but that case appears to conflict with these Ninth Circuit authorities in that it questions the "presumption" of vacatur. 951 F. Supp. 2d 1100, 1106 (E.D. Cal. 2013) (appearing to disagree with the plaintiffs' assertion that "vacatur is the presumptive remedy").

Defendants' burden to show equity demands something other than vacatur. *Pollinator*

*Stewardship*, 806 F.3d at 532 ("weigh[ing] the seriousness of the agency's errors against the

disruptive consequences of an interim change that may itself be changed.").

    Defendants do not contest that errors here are serious. *See Or. Natural Desert Ass'n v.*

*Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017) (remand without vacatur incongruous with

NEPA's dual purpose of informed decisionmaking and public participation). Counsel for

Defendants' unsubstantiated claims of a post-fire "tinderbox" do not satisfy the burden of

demonstrating "severe" consequences. *Cf. Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405–06

(9th Cir. 1995) (vacatur would wipe out an entire species of snail). Vacatur here would simply

preserve the status quo while the Forest Service completes proceedings to, *inter alia*, prepare an

EA or EIS, modify the project, and/or reinitiate consultation pursuant to any significant new

information as required by law. *League of Wilderness Defs. v. Peña*, No. 3:12-cv-02271-HZ,

2015 U.S. Dist. LEXIS 46279, at *14 (D. Or. Apr. 6, 2015) ("the disruption to the agency's plans

that will result from vacatur . . . is outweighed by the benefit of ensuring that a legal and

adequate [NEPA analysis] are in place before an irreversible logging project begins.").

## CONCLUSION

    For all of the foregoing reasons, Plaintiffs respectfully ask this Court to grant its *Motion*

*for Summary Judgment*, hold unlawful and set aside the McFarland Project, and remand to the

agency to comply with NEPA and the APA.

DATED this 22nd day of March, 2024.

    Respectfully submitted,
        s/ Mike Sargetakis
        Mike Sargetakis (OSB No. 174607, *pro hac vice*)
        mike@crag.org
        Oliver J. H. Stiefel (OSB No. 135436, *pro hac vice*)
        oliver@crag.org
        Crag Law Center
        3141 E Burnside Street
        Portland, Oregon 97214
        Phone: (503) 233-8044
        Fax: (503) 296-5454
        LEAD COUNSEL
        *Of Attorneys for Plaintiffs*