PHILLIP A. TALBERT
United States Attorney
KELLI L. TAYLOR
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700

Attorneys for the U.S. Forest Service and Supervisor Birkey
(collectively "U.S. Forest Service")

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAFE ALTERNATIVES FOR OUR FOREST ENVIRONMENT, a California nonprofit corporation; KLAMATH FOREST ALLIANCE, a California non-profit corporation; and CONSERVATION CONGRESS, a California non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>RACHEL BIRKEY, in her official capacity as Forest Supervisor of the Shasta-Trinity National Forest; and the UNITED STATES FOREST SERVICE,<br><br>Defendants. | CASE NO. 2:23-cv-01940 DJC DMC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE THE DECLARATION OF KELI MCELROY ISO DEFENDANTS' MSJ [ECF NO. 28]**<br><br>DATE  : June 6, 2024<br>TIME  : 1:30 p.m.<br>CTRM : 10, 13th Floor<br>JUDGE: Hon. Daniel J. Calabretta |

**I. INTRODUCTION**

The declaration of Keli McElroy directly responds to matters that Plaintiffs put at issue through false statements in declarations and arguments in their brief. Unsurprisingly, Plaintiffs would rather their arguments not be responded to. The declaration also provides a status report on project implementation. The declaration does not provide any *post hoc* rationalization for Project approval and is rarely referenced in Defendants' Cross-Motion for Summary Judgment. Plaintiffs' Motion to Strike lacks merit and should be denied.

///

## II. ARGUMENT

A. **McElroy's Declaration**

McElroy's declaration contains three discrete sections:

- Paragraphs 1-5 introduce the declarant, which Plaintiffs concede "may be proper." ECF 28-1, 6:11-14.
- Paragraphs 6-16 provide rebuttal to Plaintiffs' declarations.
- Paragraphs 17-27 discuss the Project and, Plaintiffs note "are relevant to Plaintiffs' Significant New Information claim." Id. at 6:17-19.

Defendants' Cross-Motion for Summary Judgment only cited the declaration a few times:

- In the factual background section regarding Project status (ECF 25-1, 6:10-19);
- One sentence in the factual background section stating: "It is too soon to know if this Owl pair will nest in their new location outside the Project area in 2024." (Id., 8:10-13);
- To confirm the Project's salvage logging is done and discuss logging costs (Id., n. 3, n. 5); and
- One sentence noting the obvious that, "If the Owls nest in the new location, they would no longer be relying upon the habitat being affected by the Project." (Id., 16:26-27; an AR cite was also included supporting this statement.)

B. **The Court Can Consider McElroy's Declaration**

McElroy's declaration does not provide an impermissible *post hoc* rationalization for Project approval as Plaintiffs argue. Instead, it corrects the record on misstatements made in Plaintiffs' declaration and provides a Project update. Because McElroy's declaration responds to Plaintiffs' brief and declarations, it could not have been provided sooner as Plaintiffs demand. *Id.,* 6:22-23, n. 2, 3.

1. **McElroy Corrects Misstatements in Plaintiffs' Declarations.**

The first five paragraphs of McElroy's declaration identify who she is and describe her connection to the Project, which even Plaintiffs admit "may be proper." ECF 28-1, 6:11-14. The following eleven paragraphs (¶¶ 6-16) provide a direct response to misstatements in Plaintiffs' declarations, which was discussed in more detail in Defendants' reply in support of its Motion to Strike. If the court strikes the challenged portions of Plaintiffs' declarations as Defendants requested, then paragraphs 6-16 of McElroy's declaration can also be disregarded. If, however, the Court does not strike the improper

statements from Plaintiffs' declarations then the Court should not strike McElroy's responses in paragraphs 6 to 16.

**2.     Information regarding logging satisfies the "explanatory in nature" exception.**

McElroy's discussion of the Project operations and logging (Dec. ¶¶ 17-26), including that salvage operations are done, are explanatory in nature and appropriate because the APA allows courts to accept material that is "explanatory in nature" from "the involved administrative officials to demonstrate the basis for their action." *See Asarco Inc. v. EPA*, 616 F.2d 1153, 1159-60 (9th Cir. 1980) (confirming courts may receive agency materials that provide "background information," show "whether the agency considered all the relevant factors," or permit the court to ascertain fully the agency's "course of conduct or grounds of decision"); *Friends of the Payette*, 988 F.2d at 992, 997; *Cent. Sierra Envtl. Res. Ctr. v. U.S. Forest Serv.*, 916 F. Supp. 2d 1078, 1092 (E.D. Cal. 2013); *Cascadia Wildlands Project v. U.S. Forest Serv.*, 386 F. Supp. 2d 1149, 1158-59 (D. Or. 2005). Even cases Plaintiffs cite confirm this is the law. *See, e.g.,* ("A reviewing court may consider extra-record materials . . . .") (ECF 28-1, 8:11). The court may also rely upon extra record declarations from agency experts that explains scientific or technical information. *Sawtooth Mountain Ranch LLC v. U.S. Forest Serv.*, No. 1:19-cv-000118-CWD, 2019 WL 2477608, at *20 n.18 (D. Idaho, June 13, 2019) (citing *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *W. Watersheds Project v. U.S. Fish & Wildlife Serv.*, No 4:13-cv-176-BLW, 2013 WL 3270363, at *7 (D. Idaho June 26, 2013) (relying upon extra record evidence demonstrating institutional knowledge by the Forest Service.)

McElroy's declaration discusses the reason why the Forest included salvage logging in the Project; that is, to efficiently and effectively remove dead material from the Forest without having to secure as much funding to pay for its removal, to facilitate faster fuels reduction and site preparation and expedite replanting. McElroy's discussion of the salvage, and commercial, logging aspects of the Project satisfies the explanatory in nature exception to the APA's record rule and is not a post hoc rationalization. Accordingly, it should not be stricken.

The fact that all of the salvage logging for the Project has been completed, pursuant to FWS's 7(d) letter and based on the condition of the wood, can also be considered by the Court in determining whether any new significant information exists and for any potential remedies in this case. For example, in the

unlikely event the Court finds NEPA was violated by allowing salvage logging in the Project under CE-6, the vacatur should not be granted since the salvage logging is complete.

### 3. Information regarding the Owls appropriately responds to Plaintiffs' claims.

McElroy's statements about the owls are likewise not *post hoc* rationalizations. Instead, they address issues raised by Plaintiffs, who themselves are relying on the post decisional BO and incidental take statements. Much of the information is already in the record, including what the Owl surveys showed in the years after the fire - including that the 2022 surveys showed the Owls successfully nested in a different nearby location (AR_56, 57) and the 2023 surveys showed the Owls moved out of the existing 0435 activity center and into a new location close to the previously inactive 0415 activity center (AR_57). Plaintiffs argue these shift changes were "predicted" and likely due to Project activities. AR 27, 13:17-14:4. McElroy's declaration is appropriate to address these claims and to supplement information already in the record that shows it is highly unlikely the Project caused the Owls to move because, prior to the BO and recent surveys, activities implemented within the 0435 activity center occurred outside of suitable habitat, followed seasonal restrictions, and were ones FWS agreed would generally not adversely affect or cause incidental take of the Owls. AR_55-56, 2734, 2737. Additionally, even after the 7(d) deferred treatments began in the 0435 activity center, Project restrictions would have prevented interference with the Owls, had they still been present. AR_45-47. Owl nesting and reproduction varies from year to year, and the 0435 Owl pair had three consecutive years of successful nesting before 2023. AR_55-56, 2636, 2570, 8214. It is too soon to know if this Owl pair will nest in their new location outside the Project area in 2024. McElroy Dec. ¶ 26.

### III. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Strike McElroy's declaration.

DATED:  April 12, 2024

PHILLIP A. TALBERT
United States Attorney

By: /s/ Kelli L. Taylor
KELLI L. TAYLOR
Assistant United States Attorney
Attorney for Defendants